COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Beales and Lorish
Argued at Richmond, Virginia

UNPUBLISHED

WILLIAM ARTHUR GREENE, JR.

v.      Record No. 0931-22-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE RANDOLPH A. BEALES
DECEMBER 28, 2023

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Steven C. McCallum, Judge

Leonard McCall (McCall Law P.C., on brief), for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, William Greene was convicted of robbery and conspiracy to commit

robbery. On appeal, Greene argues that the evidence was insufficient to support both of his

convictions. Greene also argues that the trial court erred when it denied his motion for a mistrial

after the attorney for the Commonwealth questioned Greene about a potential alibi witness and then

commented on the absence of that potential alibi witness during closing arguments. Greene further

argues that his constitutional and statutory speedy trial rights were violated. Finally, Greene

contends that the trial court should have sentenced him under the newly amended version of Code

§ 18.2-58 for his robbery conviction.

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial." *Scott v.*

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

*Commonwealth*, 292 Va. 380, 381 (2016). In doing so, the Supreme Court has stated that we, on appeal, must "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Parks v. Commonwealth*, 221 Va. 492, 498 (1980) (quoting *Wright v. Commonwealth*, 196 Va. 132, 137 (1954)).

Dwayne Swann lived with his mother, Edwina Swann, and his uncle, Chauncey Evans, in Chesterfield. Evans testified at trial that he was in his bedroom on the night of February 14, 2019, when he heard yelling coming from another part of the house. Evans suddenly heard someone say "hey, man," followed by the sound of a gunshot. An outside motion-sensing light came on, and Evans then waited about a minute before he went outside to his back deck. Evans saw Dwayne lying dead on the steps of the deck, and he then called 911 at 10:37 p.m. Evans's neighbor testified that she saw a silver or white sedan "zooming off down the street" after she heard "a commotion" next door.

Chesterfield County Police Detective Kevin Bates soon arrived at the scene, and he testified that Dwayne "had blood on both of his hands and his head." Dwayne had a "T" shaped wound on the top of his head and a bullet wound to the back of his head. Detective Bates stated, "His [Dwayne's] right pocket of his pants had been unturned, or pulled out. There was no blood around the pockets." Detective Natasha Strickland accompanied Detective Bates to the scene, and she went into Dwayne's room upstairs where she saw numerous pill bottles. Detective Strickland also saw that the drawers of Dwayne's nightstand and armoire were pulled out. Detective Bates walked through the rest of the home, and he noticed an HDMI television cord on the steps outside of the front door. He then saw blood on the front door handle inside the home, as well as "blood spatter on the wall next to the stairs that are immediately inside the residence, leading up to the second story." Detective Bates testified, "There was a blood trail, red stains leading to the couch in the

family room." He noted, "There was a good amount of blood where it appears as somebody sat down on the couch and dripped blood." Detective Bates then saw that there was a trail of blood leading through the kitchen area toward the door that leads to the home's back deck. He also noticed that "the television was missing from the kitchen."

Detective Bates testified that other officers from the Chesterfield County Police Department were able to locate Dwayne's cell phone in an area in Henrico County. Dwayne's cell phone was found in the woods about twenty yards away from a light blue sedan parked on the street. The sedan was determined to belong to William Greene, and it was parked on a street near the apartment complex of Greene's girlfriend. Detective Bates looked at Dwayne's call records, and he noticed that "[t]he last three calls, before the 9-1-1 call, were from the same phone number" which belonged to Erika McNeil. McNeil consented to a search of her cell phone data, and the data showed that she spoke with Dwayne, with Greene, and also with a man named Tramelle Jones throughout the day of the robbery.

FBI Special Agent Jeremy D'Errico, an expert witness in "historical cell site and location data analysis," testified that he analyzed the cell phone location data for Dwayne Swann, McNeil, Jones, and Greene. Greene's cell phone location data showed that he was at a Food Lion parking lot near Dwayne's home between 9:22 p.m. and 10:06 p.m. on the night of the robbery. Greene called McNeil three times during this period of time. McNeil's cell phone data showed that she left her home after Greene called her, and she went to the same Food Lion parking lot as Greene. McNeil spoke with Dwayne on the phone at 10:06 p.m. while she was still at the parking lot. The cell phone data shows that Greene and McNeil then left the Food Lion parking lot to go toward Dwayne's home after McNeil's phone call with Dwayne had ended. McNeil spoke with Dwayne on the phone

before she sent two text messages to Greene.[1] At 10:28 p.m., while Greene and McNeil were near Dwayne's home, McNeil called Dwayne again. The data then shows that McNeil was traveling away from Dwayne's home shortly thereafter and that she called both Greene and Jones during this time.

Detective Bates testified that, later that same evening, McNeil drove her car to a 7-Eleven close to Jones's home. The 7-Eleven security footage showed that she went to the 7-Eleven with her boyfriend, Keith Bailey. The footage also shows that Greene drove to the 7-Eleven with Jones and that Greene parked his car next to McNeil's car. Bailey exited McNeil's car, and he then sat in the back seat of Greene's car. Bailey got back into McNeil's car, and they then left the 7-Eleven.

On March 8, 2019, Detective Bates interviewed Greene about the February 14, 2019 robbery. Detective Bates testified that Greene "stated that either the night before or that night he went to his uncle's house in Stevens Hollow, which is maybe a mile away from the victim's house."[2] Greene also "said that he had been with Tramelle [Jones] all night." Detective Bates asked Greene about his connection with Bailey and McNeil, and Greene "said he had not had contact with them before or after." Detective Bates then showed Greene photographs of the 7-Eleven security footage that depicted Bailey entering Greene's car, and Detective Bates testified that Greene "was very defensive in saying that he didn't know these people." When Detective Bates confronted Greene with the fact that Dwayne's cell phone was found near Greene's car, Greene stated, "I didn't throw the phone." Detective Bates also interviewed Bailey and McNeil, and both admitted that they went to Dwayne's house at around 10:00 p.m. on February 14, 2019, to buy drugs from Dwayne.

---

[1] The record does not contain the content of those text messages. Detective Bates testified that McNeil deleted the text messages from her phone.

[2] Greene's uncle testified that he did not see Greene on February 14, 2019.

Greene was charged by direct indictment on August 12, 2020. He was then arrested on October 23, 2020, and he was held without bail. On January 4, 2021, counsel for Greene and the attorney for the Commonwealth made a joint motion to continue the case so as to have trial on August 23, 2021. On June 25, 2021, Greene filed a motion to dismiss based on alleged speedy trial violations. Greene's jury trial started on August 23, 2021.

At trial, Greene testified that he was with Jones on the evening of February 14, 2019, and the two men were "smoking a little weed" and "sniff [sic] a little heroin as well." Greene let Jones borrow his car that evening so that Jones could "bring some more heroin." Greene testified that he keeps an extra cell phone in his car because "that's what I got all my music and stuff on." While Jones was driving Greene's car that evening, Greene testified that he was with his girlfriend until she left for work at midnight.

During cross-examination, the attorney for the Commonwealth asked Greene about his girlfriend. The attorney specifically asked, "[S]o based on what you said today, you didn't think to give the police the name of the person who could exonerate you from this whole incident, correct?" Greene then acknowledged that he did not tell Detective Bates during their interview that he was with his girlfriend on the night of February 14, 2019. The attorney for the Commonwealth stated during closing arguments, "For the first time in two and a half years, he's [Greene] claimed that he was with his girlfriend. Which, again, by his own admission today, he admits he did not tell Detective Bates. He also doesn't have her here today. She's not testified in defense." Counsel for Greene then moved for a mistrial, which the trial court denied. Greene was ultimately found guilty of robbery and of conspiracy to commit robbery by the jury, and he now appeals to this Court.

II. ANALYSIS

A. Constitutional and Statutory Speedy Trial

Greene argues, "The trial court erred when it denied Greene's motion to dismiss based on the violations of Greene's statutory and constitutional rights to a speedy trial." On appeal, statutory speedy trial and constitutional speedy trial questions present mixed questions of law and fact. *Young v. Commonwealth*, 297 Va. 443, 450 (2019). This Court "reviews legal questions de novo, while giving deference to the trial court's factual findings." *Id.*

For statutory speedy trial, Code § 19.2-243 requires the Commonwealth to start a defendant's trial before 152 (and a fraction) days have passed since the defendant was arrested and held in custody. *See Moten v. Commonwealth*, 7 Va. App. 438, 441 (1988). The statute also "provides for tolling if the defendant joins in or fails to object to a continuance motion made by the Commonwealth." *Ali v. Commonwealth*, 75 Va. App. 16, 30 (2022). Here, Greene was arrested on October 23, 2020, and he was held without bail. On January 4, 2021, after 73 full days of being held in custody, Greene and the Commonwealth jointly moved for a continuance to set the trial to begin on August 23, 2021. Consequently, given that the mutually agreed-upon continuance tolled the running of the statutory speedy trial clock for all but 73 of the 152 allowable days, Greene's statutory speedy trial rights clearly were not violated.

Likewise, Greene's constitutional speedy trial rights also were not violated here. "The test for determining whether a speedy trial violation has occurred requires balancing four main factors— the 'length of delay, reason for delay, defendant's assertion of his right, and prejudice to the defendant.'" *Reedy v. Commonwealth*, 77 Va. App. 81, 93 (2023) (quoting *Howard v. Commonwealth*, 281 Va. 455, 462 (2011)). Despite being charged by direct indictment about one year before his trial began, Greene jointly moved with the Commonwealth for the continuance that set his trial date for August 23, 2021 so the majority of the delay here is attributable to Greene.

In addition, the record on appeal does not indicate that Greene has suffered any specific prejudice. *See Ali*, 75 Va. App. at 47 ("Conversely, if the Commonwealth bears no fault in the delay and proceeds 'with reasonable diligence,' then the defendant's 'speedy trial claim w[ill] fail . . . as a matter of course however great the delay, so long as [the defendant cannot] show specific prejudice.'" (alterations in original)). Given that Greene is responsible for most of the delay and given that Greene has not shown that he has suffered any specific prejudice, the constitutional speedy trial factors clearly weigh in favor of the Commonwealth. Therefore, Greene's constitutional speedy trial rights were not violated, and the trial court did not err when it denied Greene's motion to dismiss.

### B. The Questions and Comments About Greene's Potential Alibi Witness

Greene argues that the trial court erred by allowing the attorney for the Commonwealth to question Greene "as to the lack or non-existence of an alibi witness or a witness that could exonerate Greene of 'everything.'" Greene also argues that the trial court erred by denying his motion for a mistrial for the comments in the attorney for the Commonwealth's closing argument about Greene's failure to call his girlfriend as an alibi witness. On appeal, a trial court's evidentiary decision and a trial court's denial of a motion for a mistrial are both reviewed under an abuse of discretion standard of review. *See Harvey v. Commonwealth*, 76 Va. App. 436, 475 (2023); *Gross v. Stuart*, 297 Va. 769, 774 (2019).

Here, Greene chose to testify in his own defense and he, therefore, subjected himself to cross-examination and potential impeachment. The Commonwealth impeached Greene's testimony that he had spent the evening with his girlfriend by questioning Greene about his prior statement to Detective Bates "that he had been with Tramelle [Jones] all night." During closing argument, the Commonwealth then highlighted the inconsistency between Greene's testimony at trial and his previous statements to Detective Bates. The Supreme Court has held that a defendant's failure to

- 7 -

call an alibi witness "'was the legitimate subject of comment by the Commonwealth's attorney' and 'a circumstance to be considered by the jury.'" *Russell v. Commonwealth*, 216 Va. 833, 836 (1976) (quoting *Robinson v. Commonwealth*, 165 Va. 876, 881 (1936)); *see also Pollino v. Commonwealth*, 42 Va. App. 243, 251-52 (2004) (permitting the prosecutor to comment on the absence of a potential defense witness). Consequently, given the clear precedent on this question from the Supreme Court and from this Court, the attorney for the Commonwealth did not improperly comment during closing argument on the absence of Greene's girlfriend from testifying at trial. In addition, given that the absence of Greene's girlfriend at trial was "a circumstance to be considered by the jury," the attorney for the Commonwealth could also impeach Greene's credibility on this point during cross-examination when Greene provided inconsistent statements. *Russell*, 216 Va. at 836. Therefore, the trial court did not abuse its discretion when it allowed the attorney for the Commonwealth to question Greene about the absence of his girlfriend at trial. Furthermore, the trial court also did not abuse its discretion when it permitted the attorney for the Commonwealth to later comment in his closing argument on the failure of Greene's girlfriend to testify at trial.

### C. Sufficiency of the Evidence

Greene also argues that the evidence was insufficient for his convictions for robbery and conspiracy to commit robbery. Specifically, Greene argues,

> The trial court erred by refusing to grant Greene's motion to strike the robbery and conspiracy to commit robbery charges where the Commonwealth failed to prove beyond a reasonable doubt that there was an actual robbery committed by way of a taking accomplished with force or the threat of force.

On appeal, "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting

*Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)).  "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  *Id.* (alteration in original) (quoting *Pijor*, 294 Va. at 512).  "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Williams v. Commonwealth*, 278 Va. 190, 193 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In addition, the Supreme Court has stated, "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt."  *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983).

"In Virginia, robbery is a common law crime defined as the 'taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation.'"  *Jay v. Commonwealth*, 275 Va. 510, 524 (2008) (quoting *Pierce v. Commonwealth*, 205 Va. 528, 532 (1964)).  "The violence must occur before or at the time of the taking" for a robbery conviction.  *Branch v. Commonwealth*, 225 Va. 91, 94 (1983).  The Supreme Court has also stated, "Conspiracy is defined as 'an agreement between two or more persons by some concerted action to commit an offense.'"  *Wright v. Commonwealth*, 224 Va. 502, 505 (1982) (quoting *Falden v. Commonwealth*, 167 Va. 542, 544 (1937)).

Here, the evidence at trial showed that Greene was present at the crime scene, given that Greene's cell phone data showed that he was at Dwayne Swann's home around the time of the robbery.  Furthermore, the jury could reasonably conclude that Greene used violence or intimidation prior to taking Dwayne's television.  Given the trail of blood that started at the front door and continued through Dwayne's home, the jury could reasonably conclude that Dwayne was struck in the head as he opened the door to try and sell drugs to McNeil and Bailey – and that Dwayne's television was then taken out of the kitchen after Dwayne had been struck and was bleeding badly

as he moved throughout the house. The jury's finding is also consistent with Chauncey Evans's testimony that he heard yelling in the house before he heard the gunshot that killed his nephew, Dwayne Swann.

Furthermore, Greene's conflicting testimony and his statements to Detective Bates demonstrate his consciousness of guilt. During Greene's March 8, 2019 interview with Detective Bates (which took place only a couple of weeks after the robbery occurred), Greene told Detective Bates "that he had been with Tramelle [Jones] all night." However, Greene changed his story at trial, and he testified that he was with his girlfriend that night – even though he never mentioned his girlfriend to Detective Bates. When Detective Bates asked Greene about Dwayne's cell phone, which was found in some woods near Greene's vehicle, Greene responded, "I didn't throw the phone." Furthermore, Greene "was very defensive in saying that he didn't know these people [Bailey and McNeil]" even though the call records show that Greene spoke with McNeil throughout the night of February 14, 2019, and security footage shows that Bailey met Greene in the 7-Eleven parking lot later that same night after the robbery had occurred. Consequently, given the extensive cell phone data, given the physical evidence inside Dwayne's home, and given Greene's own inconsistent statements, we certainly cannot say that no rational factfinder could have found the evidence sufficient for Greene's robbery conviction.

In addition, the evidence also showed that Greene took part in a conspiracy to commit robbery because it showed that he communicated with and met with McNeil and Jones prior to the robbery. Greene then communicated (through phone calls and text messages) with McNeil both immediately before and shortly after the robbery occurred. The cell phone data showed that Greene's cell phone, Jones's cell phone, and McNeil's cell phone were all at a Food Lion parking lot together prior to when the robbery took place. In fact, the cell phone data showed that McNeil left her home to drive to the Food Lion not long after Greene had called her. Consequently, the jury

could reasonably conclude that Greene met with McNeil at the Food Lion parking lot to plan the robbery of Dwayne Swann. Therefore, we cannot say that no rational factfinder could have found the evidence sufficient for Greene's conspiracy to commit robbery conviction.

D. Sentencing for Robbery Conviction

In his final assignment of error, Greene argues that the trial court should have sentenced him under the newly amended version of Code § 18.2-58. "[T]he issue of whether a statute should be applied retroactively presents a question of law that we review *de novo* on appeal." *Taylor v. Commonwealth*, 44 Va. App. 179, 184 (2004).

Effective July 1, 2021, the General Assembly amended Code § 18.2-58 to limit the penalties for a robbery conviction. Greene contends that the trial court should have sentenced him under the newly amended statute enacted in 2021 for a crime that he committed in 2019. When determining whether to give a newly amended statute retroactive effect, the Supreme Court has repeatedly stated, "Our analysis is guided by the fundamental principles of statutory construction that retroactive laws are not favored, and that a statute is always construed to operate prospectively unless a contrary legislative intent is manifest." *Berner v. Mills*, 265 Va. 408, 413 (2003); *see also Montgomery v. Commonwealth*, 75 Va. App. 182, 190 (2022) ("[A] statute may apply retroactively when the General Assembly uses explicit terms detailing the retroactive effect of the legislation."). In addition, when a new statute changes the penalty of a conviction while the case is pending, "the penalty in existence at the time of the offense should be applied unless the Commonwealth first elects to proceed under the new statute and obtains the consent of the defendant to do so." *Ruplenas v. Commonwealth*, 221 Va. 972, 978 (1981); *see also* Code §§ 1-238 and 1-239.

Code § 18.2-58, like many other newly amended statutes recently analyzed by this Court, simply does not have retroactive effect. *See, e.g.*, *Gionis v. Commonwealth*, 76 Va. App. 1, 16 (2022) (holding that Code § 18.2-104 did not apply retroactively). When looking at the text of Code

§ 18.2-58, the General Assembly did not include "an express statement indicating that it is to be applied retroactively." *Street v. Commonwealth*, 75 Va. App. 298, 307 (2022) (holding that Code § 4.1-1302(A) did not apply retroactively). Furthermore, the record clearly shows that the Commonwealth did not consent in this case to the application of the newly amended version of Code § 18.2-58. Consequently, because Code § 18.2-58 does not have retroactive application and because Greene committed the robbery offense in 2019, the trial court did not err when it sentenced Greene according to the law that was in effect at the time that the relevant offense was committed.

### III. CONCLUSION

In short, the Commonwealth's evidence showed that Greene conspired to rob Dwayne Swann and that Greene then actively participated in that robbery. Greene's statutory and constitutional speedy trial rights were not violated because both Greene and the Commonwealth sought the continuance and agreed to the trial date that resulted in the majority of the delay leading up to Greene's trial. In addition, given clear precedent from the Supreme Court, it was entirely proper for the attorney for the Commonwealth to question Greene about (and to comment on) Greene's failure to call his girlfriend as an alibi witness. Finally, the trial court did not err when it applied the penalty under Code § 18.2-58 that was in effect at the time that Greene committed the robbery.

For all of these reasons, we affirm the trial court's judgment and uphold Greene's convictions.

*Affirmed.*